FILED by \_\_\_TB\_\_\_ D.C.

Jun 17, 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **15-20456-CR-BLOOM/VALLE**

18 U.S.C. § 1349
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs.

KHALED ELBEBLAWY,

        Defendant.

_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### The Medicare Program

1.    The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3.    "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required

home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

### Part A Coverage and Regulations

#### Reimbursements

6. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

    a.    the patient was confined to the home, also referred to as homebound;

b. the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c. the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8. In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier

Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11. Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction

provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12. Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA. The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13. For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14. While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure

appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendant and Related Entities

15. Willsand Home Health Agency, Inc. ("Willsand HH") was incorporated on or about July 10, 2000, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries. On or about October 5, 2004, Willsand HH obtained Medicare provider number 10-8100, authorizing it to submit claims to Medicare for HHA-related benefits and services.

16. JEM Home Health Care, LLC ("JEM HH") was a limited liability Florida corporation incorporated on or about May 29, 2003, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries. In or around July 2004, JEM HH obtained Medicare provider number 10-8062, authorizing it to submit claims to Medicare for HHA-related benefits and services.

17. **KHALED ELBEBLAWY**, a resident of Broward County, was an office manager at Willsand HH, and an owner of JEM HH.

### COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

From in or around 2006, and continuing through in or around 2011, the exact dates being unknown to the United States Attorney, in Miami-Dade County, in the Southern District of

Florida, and elsewhere, the defendant,

**KHALED ELBEBLAWY,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Eulises Escalona, and with others known and unknown to the United States Attorney, to violate Title 18, United States Code, Section 1347, that is: to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## PURPOSE OF THE CONSPIRACY

18. It was a purpose of the conspiracy for **KHALED ELBEBLAWY** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying kickbacks and bribes to patient recruiters for referring Medicare beneficiaries to serve as patients; (b) submitting and causing the submission of false and fraudulent claims to Medicare; and (c) concealing and causing the concealment of the submission of false and fraudulent claims to Medicare.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

19. **KHALED ELBEBLAWY,** Eulises Escalona and their co-conspirators paid kickbacks to co-conspirator patient recruiters in exchange for referring Medicare beneficiaries to

Willsand HH and JEM HH to serve as patients.

20. **KHALED ELBEBLAWY**, Eulises Escalona and their co-conspirators submitted and caused the submission of at least approximately $42 million in false and fraudulent claims to Medicare, seeking payment for home health services purportedly provided to beneficiaries by Willsand HH, when, in fact, such services were not medically necessary and not provided.

21. As a result of these false and fraudulent claims, **KHALED ELBEBLAWY**, Eulises Escalona and their co-conspirators caused Medicare to pay more than $27 million to Willsand HH.

22. **KHALED ELBEBLAWY** and his co-conspirators submitted and caused the submission of at least approximately $12 million in false and fraudulent claims to Medicare, seeking payment for home health services purportedly provided to beneficiaries by JEM HH, when, in fact, such services were not medically necessary and not provided.

23. As a result of these false and fraudulent claims, **KHALED ELBEBLAWY** and his co-conspirators caused Medicare to pay more than $10 million to JEM HH.

24. **KHALED ELBEBLAWY**, Eulises Escalona and their co-conspirators used the money fraudulently obtained from Medicare for their personal benefit and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

1. The allegations contained in this Information are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which **KHALED ELBEBLAWY** has an interest.

2. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction for the offense charged in this Information, **KHALED ELBEBLAWY** shall forfeit to the United

-9-

States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures outlined in Title 21, United States Code, Section 853.

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
GEJAA T. GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
LISA H. MILLER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

KHALED ELBEBLAWY,

              Defendant.
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)

_X_ Miami      ___ Key West
___ FTL      ___ WPB      ___ FTP

New Defendant(s)     Yes ___    No ___
Number of New Defendants    ___
Total number of counts    ___

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)    __No__
   List language and/or dialect    _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                          (Check only one)

   I    0 to 5 days     _X_           Petty     ___
   II    6 to 10 days    ___           Minor     ___
   II    11 to 20 days   ___           Misdem.    ___
   IV   21 to 60 days   ___           Felony     _X_
   V:   61 days and over

6. Has this case been previously filed in this District Court? (Yes or No)    __No__
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No)    __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)    __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ___ Yes   _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ___ Yes   _X_ No

                                     _____
                                     LISA H. MILLER
                                     DOJ TRIAL ATTORNEY
                                     Court No. A5502054

*Penalty Sheet(s) attached                                                          REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** KHALED ELBEBLAWY

**Case No:** _____

Count #: 1

18 U.S.C. § 1349

Conspiracy to Commit Health Care Fraud

**\*Max Penalty**: Twenty (20) years' imprisonment.

Count #:

**\*Max Penalty**:

Count #:

\*Max Penalty:

Count #:

\*Max Penalty:

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Khaled Eleblawy, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*